THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF SOUTH CAROLINA

CHARLESTON DIVISION

| | | |
|---|---|---|
| The Estate of Jane Doe 202, by HS, the personal representative of her estate, | ) ) ) ) | Civil Action No. 2:23-cv- 05139-RMG-MGB |
| Plaintiff, | ) ) | |
| vs. | ) ) | |
| City of North Charleston, Leigh Anne McGowan, individually, Charles Francis Wholleb, individually, Anthony M. Doxey, individually; | ) ) ) ) ) | |
| Defendants. | ) | |
| ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯ | ) | |

Complaint

1.    This is an action under federal law for money damages and injunctive relief, pursuant to 42 U.S.C. §§ 1983 and 1988 and under the Constitution of the United States.

2.    The court has federal question jurisdiction under 28 U.S.C. § 1331.

3.    Jane Doe 202 was a citizen and resident of South Carolina. She died in 2018, at age 70, of complications from dementia. Her estate is in Charleston County. HS, her brother, is her personal representative. In the six

1

years before her death he also held her powers of attorney both generally and for health care decisions. He is a citizen and resident of South Carolina. Both she and HS are referred to in this complaint using pseudonyms out of considerations for her privacy in light of each of (a) her compromised neurological state, (b) to comply with S.C. Code § 43-35-60 and (c) a state court order to maintain as confidential information about a vulnerable adult, and (d) to comply with a state court expungement order.  She is referred to in this complaint as Jane Doe. The Defendants are aware of the identity of Jane Doe as well as each family member referred to in this complaint.

4.     The events which gave rise to this case occurred in 2014, in Charleston County. Jane Doe 202 filed  state court suit in 2014, but could not get the state created danger cause of action fully litigated in that action.

5.     In that case, the trial court directed a verdict on the state created danger cause of action. Jane Doe appealed. During that appeal, Jane Doe passed away and in her estate was substituted as a party.

6.     The South Carolina Court of Appeals declined to rule on the state created danger issue identified in the appeal.

7.     Jane Doe's estate petitioned for certiorari on two issues, one of which was the state created danger issue. The South Carolina Supreme Court

refused to grant certiorari on the state created danger issue, agreeing to hear only the other issue in the petition.

8.      On September 29, 2023, the South Carolina Supreme Court ruled without considering or ruling on the state created danger issue.

9.      This action is filed because the state courts of South Carolina would not "allow full litigation of a constitutional claim," and were "unable or unwilling to protect federal rights," as expressed in *Allen v. McCurry*, 449 U.S. 90 (1980), creating in the estate of Jane Doe 202 the right to file this action in the federal court.

10.     Jane Doe suffered from a particularly aggressive form of early onset Alzheimer's disease.

11.     Starting in late 2012 Jane Doe had become incompetent and HS took over managing her affairs. Among other things, HS moved Jane Doe to what had been their mother's house, which became jointly owned by HS and Jane Doe after their mother had passed away. That house was a split-level house in North Charleston, not far from the home of HS and his wife. Moving Jane Doe to that property enabled him to check on Jane Doe frequently. Also in 2012, to benefit Jane Doe, HS subordinated his joint ownership interest in that property so as to enable Jane Doe to have a life estate in the

entirety of that property. HS subordinated his fee simple half interest to his sister's life estate.

12.    As Jane Doe's aggressive form of dementia progressed, Jane Doe required more frequent care. Starting in late 2012, Jane Doe's daughter, who had been living and working in a foreign country, moved back to the United States to take up residence with Jane Doe so as to care for her. The daughter worked closely with her uncle, HS, to care for Jane Doe.

13.    In March 2014, when the events underlying this case took place, Jane Doe's daughter had been caring for Jane Doe for over a year; Jane Doe by that time was unable to drive, or make a telephone call, or use the restroom unassisted, or dress herself, or change her clothes, or prepare food, or even open any container or package of food. The daughter found work which enabled her to work largely at home, which gave her the flexibility to assist her mother.

14.    Jane Doe was a vulnerable adult under state law. At the time of the 2014 events, she had a mental impairments as a result of a physical condition in the form of organic brain damage which substantially impaired her from adequately providing for her own care or protection.

15.    The City of North Charleston is a political entity within Charleston County authorized to sue and be sued.  Among other things, it

operates a police force.  It is referred to in this complaint as the City.  In this complaint, the City is sued for injunctive relief, to compel it to have its officers act consistently with federal rights and state law as to what state law defines as a vulnerable adult.

16.    At all times pertinent to this complaint, Defendants Leigh Anne McGowan, Charles Francis Wholleb, and Anthony M. Doxey, each of whom is sued individually, were police officers with the City who had contact with Jane Doe in March, 2014, and who later in 2014 hired a corrupt agent to further damage Jane Doe and her family.  When referred to collectively, the individual defendants are identified as "the NCPD Defendants."  The City of North Charleston Police Department is referred to in this complaint as the NCPD.

17.    The Court has jurisdiction over the subject matter of this action and jurisdiction over the parties to this action.

Nature of Wrongdoing

18.    Jane Doe's property was across the street from neighbors who were aware that Jane Doe had Alzheimer's disease. Unknown to any of HS, Jane Doe or her daughter, those neighbors objected to Jane Doe being cared for in her home.

19.    About 10 p.m. on Thursday, March 27, 2014, Jane Doe's daughter went outside to retrieve something from her car. When the door to the house closed behind her, it locked her out.

20.    The daughter called to Jane Doe to let her back in, which Jane Doe did. It was about 10:05 p.m.

21.    The neighbors across the street heard the daughter's calls to her mother, realized their opportunity, and even though Jane Doe had already let her daughter back into the house, at 10:06 p.m., the neighbors called 911.

22.    According to 911 records, at 10:07 p.m., the neighbors reported, falsely, "family arguing across the st[reet]."   At 10:08 p.m., the 911 records reflect the report was categorized as "a verbal disturbance" and as "female pounding on the door and screaming."

23.    At 10:08 p.m., officer Doxey was dispatched to the scene from the North Charleston City Hall police station.

24.    At 10:09 p.m., officer McGowan was dispatched to the scene from a different location.

25.    Having started from different locations, officer McGowan traveled a route different than did officer Doxey.  Officer Doxey's arrival was delayed at a train crossing when he was *en route*.

26.    Officer McGowan arrived first, at 10:16 p.m. The scene was quiet. No one was outside, and no one answered the door at Jane Doe's home when officer McGowan knocked.

27.    For five minutes, McGowan walked about the house, including into the fenced back yard. She asked the dispatcher for more information from the neighbors.

28.    At 10:21 p.m., McGowan reported finding "a purse" and that there was "blood on the purse."

29.    At 10:21 p.m., officer Wholleb was dispatched to the scene from the police station at North Charleston City Hall. He too was delayed at the same train crossing as was officer Doxey.

30.    At 10:23 p.m., the dispatcher reported back to officer McGowan with more details provided by the neighbor: that the disturbance involved a mother with dementia and her daughter; that the mother "locked the daughter out of the house." Officer McGowan asked the dispatcher to request the neighbor meet directly with officer McGowan.

31.    At 10:24 p.m., the dispatcher reported that the neighbor agreed to meet with officer McGowan and they conferred at the neighbor's house.

32.    Also at 10:24 p.m., officers Doxey and Wholleb reported they were "delayed by train on Montague [Avenue]."

33.    At 10:27 p.m., officers Doxey and Wholleb reported they were "back en route."

34.    Officer McGowan and the neighbor conferred for about five minutes. He reiterated that Jane Doe had dementia. Among other things, the neighbor requested that he not be disclosed as the person who had called police.

35.    The 911 records don't reflect it, but it is undisputed that officers Doxey and Wholleb arrived at Jane Doe's home about 10:30 p.m. When they arrived, officer McGowan ended her conversation with the neighbor and conferred with her colleagues.

36.    Using as an ostensible "emergency" the blood officer McGowan reported finding at 10:21 p.m. on the "purse" in the back yard, later claimed to have been "substantial" blood covering the "purse," at about 10:30 p.m., officers McGowan and Wholleb made warrantless entry through a sliding glass door in the back of the residence, while officer Doxey knocked on the front door.  To make the warrantless entry, officer Wholleb explained that he overcame a locked sliding glass door in the back of the house.

37.    The ostensible purpose of the "emergency" warrantless entry was to assure that no one in the house was suffering a grievous, bleeding

injury. Nothing covered with substantial blood was ever found, but that was the "emergency" officers claimed.

38.    In the house, there was no sign of any disturbance. There was no sign of blood. Everything was quiet.

39.    Jane Doe was awakened in her second-floor bedroom and came downstairs to the first floor of the house. At 10:32 p.m., officer Doxey reported he had "someone at the front door," referring to Jane Doe. At 10:33 p.m., officer Wholleb reported he had "made contact," which, he would later explain, also referred to contact with Jane Doe. Wholleb asked Jane Doe if everything was okay. She said yes.

40.    Wholleb and McGowan asked Jane Doe to show them where her adult daughter was. Jane Doe showed them the stairs which led to the upstairs bedroom adjacent to her own bedroom, where her adult daughter was asleep.  McGowan went alone into the daughter's small bedroom.

41.    The daughter had no prior criminal record and she was engaged in no criminal conduct; she was asleep in her bed. McGowan could see that the daughter was not injured. She was not bleeding, profusely or otherwise. McGowan approached the sleeping daughter from the daughter's left side, the daughter perpendicular to McGowan.

42.    Rather than turn on any lights, or have Jane Doe wake her daughter in some way that would not be alarming, McGowan chose instead to wake the daughter in the most alarming way possible: by shining a flashlight in the daughter's face, demanding the daughter tell McGowan how much the daughter had had to drink, a request for information entirely unrelated to and irrelevant to the wellness check that was the ostensible purpose of the warrantless entry.

43.    Awakened in the dark in her upstairs bedroom in that alarming manner, by an unidentified stranger shining a flashlight in her face and barking questions at her, the daughter reacted with predictable alarm and began yelling for the stranger to get out of her house.

44.    McGowan substantially outweighed the daughter. Escalating the supposed wellness check, McGowan snapped a handcuff on the daughter's right wrist, meaning the daughter's far wrist, and using the handcuff, pulled the daughter by her wrist over McGowan's hip and to the floor, injuring the daughter's right wrist, head, mouth, hip and knee, among other things. McGowan got on top of the daughter, placed the other handcuff on the daughter, and lifted her back to the bed in which the daughter had been sleeping. After McGowan's physical assault, the daughter expected she was

about to be sexually assaulted by the unidentified stranger in the dark bedroom.

45.    At 10:41 p.m. the 911 records reflect McGowan reported the daughter had been arrested, which the 911 records designate by the code, "95*1."

46.    McGowan had no injuries, but claimed the daughter had assaulted McGowan. The daughter's various injuries, which McGowan could not explain, were later documented and photographed. The daughter was charged with assaulting a police officer, a charge that would later be dismissed and ordered expunged.

47.    McGowan summoned Wholleb and Doxey for assistance, and initiated the process that resulted in the daughter being both criminally charged and, pertinent to this action, removed from her residence and taken to the Charleston County Detention Center, leaving Jane Doe at her home, alone.

48.    The affirmative acts by the officers which removed Jane Doe's caregiver were taken under color of state law.

49.    The defendant officers each individually and collectively took affirmative acts which harmed Jane Doe and which also increased the risk of harm to Jane Doe.

50.    As she sat in the back of a police car, trying to understand how she had gone from sleeping in her bed to being assaulted by a police officer in her room and then arrested, the daughter reported that her mother could not be left alone. The transport officer, officer Kouris, told her that her mother had called police to have her arrested, information which was not true, but was consistent with the neighbor's request that he not be identified as the person who called police.

51.    Kouris would go on to repeat that false information to the Charleston County Detention Center, who would go on to repeat it to MUSC when Jane Doe was hospitalized.

52.    None of the officers thought to discuss with Jane Doe it posed a problem for Jane Doe that they had isolated her by removing her daughter. None checked to see if she was a vulnerable adult, even though state law imposed that obligation on them to do so. None reported Jane Doe to the next police shift or to the City's Office of Aging so someone could check on Jane Doe. None asked Jane Doe to enable them to communicate with any other family member. Nor did any of the officers communicate with any other family member, to assure Jane Doe's safety once their affirmative actions had removed her caregiver.

53.    As 911 records reflect, officer McGowan had been told by dispatch that Jane Doe had dementia. Officer McGowan had also been told by the neighbor that Jane Doe had dementia, as they objected to Jane Doe being in her home with dementia. Wholleb and Doxey knew or should have known that Jane Doe had dementia.  All officers knew or should have known that Jane Doe was incompetent.

54.    After removing her caregiver, none of the officers made any provision for Jane Doe's care or protection.  They left Jane Doe alone to fend for herself in her confused state of dementia, unable to care for herself.

55.    Having removed Jane Doe's caregiver, defendants McGowan, Wholleb, Doxey each had a duty to report that Jane Doe was likely to be neglected. Each was aware, or should have been aware, that Jane Doe had dementia and was unable to care for herself.

56.    Starting at about 11 p.m., Jane Doe was left alone to fend for herself due to the affirmative actions of the defendants. She had not spent a night alone since 2012, and since that time her capacities had been considerably diminished by her disease.

57.    At the Charleston County Detention Center, the daughter was not permitted to make a phone call until well into the following day.

58.     Eventually, the daughter was allowed to leave a voice mail message for her uncle, HS. About 1:30 p.m. the next day, HS got a message about the daughter and was able to leave his job to check on Jane Doe. He found her "not in good shape," meaning distraught and upset, hungry, in need of liquids, and in soiled clothing.

59.     About 3 p.m., HS was able to get his niece out of the detention center. After returning to her mother's house, the daughter was able to care for herself and for Jane Doe, including changing Jane Doe's soiled clothing.

60.     Two days later HS had Jane Doe evaluated due to how confused she was. Jane Doe was admitted to the hospital.

61.     The hospital assessed that Jane Doe required 24 hour supervision "due to her confusion."

62.     Jane Doe's confusion was exacerbated by Defendants McGowan, Wholleb, Doxey. They collectively disrupting her care, assaulting her caregiver in front of her, arresting her caregiver in front of her, and then left Jane Doe to fend for herself when each knew or should have known that Jane Doe was a vulnerable adult unable to provide for her own care or protection.

63.    At the hospital Jane Doe was also found to have a urinary tract infection. Her treating physician opined that the period she spent in soiled clothing increased the risk of a urinary tract infection.

64.    Jane Doe required prolonged hospitalization at the Medical University of South Carolina (MUSC). The trauma and confusion created for her by the Defendants caused her to stop eating. Her condition became so critical that HS was asked by MUSC to provide instructions on what they should do if Jane Doe required resuscitation.

65.    Initially, MUSC could not consult with Jane Doe's daughter about her care due to the false information that originated with McGowan that Jane Doe was afraid of her daughter and had summoned the police about her daughter. Eventually HS was able to satisfy MUSC that that information was false. The delay deprived MUSC of the best information about what would most likely entice Jane Doe to eat. Once MUSC began consulting with the daughter, and allowed her to visit, Jane Doe began to recover.

66.    On April 18, 2014 Jane Doe was discharged from MUSC back to her home.

67.    The confusion caused by the affirmative acts of Defendants McGowan, Wholleb and Doxey exacerbated Jane Doe's pre-existing conditions

in irreversible ways, caused her physical and psychological harm, as well as impeded her medical care.

68.    After suit was filed in state court the defendants hired an agent, attorney Sandra Senn, who on behalf of the defendants communicated to the neighbors, in writing, false information about Jane Doe and her daughter, deliberately complicating further the treatment options for Jane Doe. Among other things, the defendant contended that Jane Doe could not be treated safely in her own home, complicating the treatment options available to Jane Doe and her family, and risking another warrantless entry by police.  In this complaint, Senn's conduct as agent in knowingly spreading false information about Jane Doe and her daughter is attributable to the defendants.

### For a Cause of Action:
### Deprivation of Rights Under 42 USC §§ 1981 and 1983
### (State Created Danger)

69.    Allegations above are incorporated into this count as if fully stated.

70.    The defendants acted under color of state law.

71.    The defendants knew or should have known that Jane Doe was a vulnerable adult and that she had dementia.

72.    The defendants took affirmative acts to harm Jane Doe and to increase the risk of harm to Jane Doe. Among other things, the defendants:

a.  removed her caregiver from her home,

b.  failed to assess Jane Doe's status as a vulnerable adult,

c.  failed to assess Jane Doe's capacity to care for herself before leaving her alone,

d.  failed to notify any other family member, such as HS, that police had removed Jane Doe's caregiver,

e.  failed to report that they had removed Jane Doe's caregiver and had isolated Jane Doe,

f.  spread false information that Jane Doe had had her daughter arrested, which increased the risk to Jane Doe by complicating her medical care, and

g.  hired an agent to spread other false information about Jane Doe and her daughter, which also further complicated Jane Doe's medical care and increased the risk to Jane Doe,

All of which violated Jane Doe's Constitutional rights.

73.    Among other things, Jane Doe had a substantive Due Process right to:

a.  her bodily integrity,

b.  her personal security,

c. her right to associate with her daughter,

d. her right to associate with HS,

e. not have the defendants act under color of state law and have taken affirmative actions that increased her risk of harms by impeding her access to food, water, care, and personal care,

f. be protected from the defendants taking affirmative acts that placed Jane Doe in a worse position to sustain her life, thereby harming her and also having increased her risk of harm, and to

g. be protected from the defendants themselves, and their agent Senn, spreading false information which burdened her freedoms of association and impeded her medical care.

74.    Under the Equal Protection Clause, Jane Doe also had an independent substantive right to:

a. not be denied protective services to which she was entitled under state law, or

b. to have the state remove the caregiving protections her family had arranged, thereby affirmatively acting so as to

harm her, to create a danger for her, and to increase her risk of harm.

75.    By 2014 those Constitutional protections for Jane Doe were clearly established, as it was clearly established that the state could not take affirmative action to create a danger for any citizen or increase a citizen's risk of harm.  Those rights were established not later than 1989 by the United States Supreme Court decision in *DeShaney v. Winnebago County Dep't of Soc. Servs.,* 489 U.S. 189, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989).

76.    Unless enjoined, the City will continue to fund and operate its police department in a manner which deprives persons such as Jane Doe of constitutionally protected rights.

77.    Jane Doe is entitled to injunctive relief sufficient to prevent the City from failing to provide funds sufficient to train and operate its police force so as to provide proper caregiving for disabled persons and vulnerable adults when its police officers take affirmative acts to removes the caregiver for a vulnerable adult, then take affirmative acts to spread false information to complicate the medical care for a vulnerable adult, then hire an agent to spread false information about Jane Doe, HS and her daughter so as to complicate Jane Doe's medical care.

78.    The actions alleged above violated Jane Doe's Constitutional rights, caused injury to Jane Doe, and increased her risk of harm.  Unless enjoined by the Court, the City will continue to fail to train its officers against its officers taking affirmative acts to create a danger to its citizens who are afflicted with dementia or other disabling condition which makes them vulnerable adults.

79.    Jane Doe has been deprived of the rights, privileges or immunities secured to her by the Constitution and laws of the United States and South Carolina, and is entitled to injunctive relief against the City, and to actual and punitive damages against the individual Defendants McGowan, Wholleb and Doxey, in amounts to be determined by the finder of fact, to redress her injuries as a result of that deprivation and its consequential injuries.

### Demand for Jury Trial

80.    Plaintiffs on behalf of Jane Doe demand a trial by jury.

### Relief Sought

81.    Wherefore, Plaintiff HS, as personal representative of the Estate of Jane Doe 202, and on behalf of her estate and her, request that this Court:

a. Enjoin Defendant City from failing to have adequate procedures sufficient to compel its police officers to provide for the interests of vulnerable adults, including those suffering dementia if and when the City removes the caregiver of the vulnerable adult; and from operating its police department in a manner which deprived Jane Doe and others situated similarly to her of Constitutionally protected rights,

b. Actual and punitive damages, individually, against Defendants McGowan, Wholleb and Doxey.

c. Costs of suit and reasonable attorneys' fees under 42 U.S.C. § 1988, including the fees and costs devoted to the state created danger cause of action in both this action and from the state court proceedings; and

82. For such other and further relief as the Court deems just and proper.

Respectfully submitted,

*s/ Gregg Meyers*
Gregg Meyers, SC Bar No. 9908
Fed. I.D. 4183
114 4th Ave NW
Byron MN 55920
843-324-1589

attygm@gmail.com
Attorney for Plaintiff

October 16, 2023